So Ordered.

Dated: June 23rd, 2020



Whitman L. Holt
Bankruptcy Judge

*NOT FOR PUBLICATION*

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re: | Lead Case No. 19-02949-WLH12 |
| KEY FARMS, INC., | (Substantively Consolidated) |
| -and- | |
| ARTHUR & PATRICIA KEY, | **MEMORANDUM DISPOSITION REGARDING CRAMDOWN ISSUES** |
| Debtors. | |

One of the more colorful expressions in the bankruptcy lexicon is "cramdown" – a term obviously adopted for its descriptive value and representing a mechanism to impose debt restructuring terms on a nonconsensual basis. As the term suggests, the cramdown process and ultimate plan treatment are often unpleasant for the affected creditors, a result achieved by Congressional design.

The issue here involves the debtors' efforts to cramdown their principal secured creditor in a chapter 12 plan. The secured creditor contends that the proposed plan treatment does not satisfy the statutory requirements for cramdown, including because the new interest rate for the restructured indebtedness is too low. For the reasons discussed below, the court concludes the plan is generally confirmable other than with respect to the proposed cramdown interest rate.

## BACKGROUND & PROCEDURAL POSTURE

The debtors in these substantively consolidated chapter 12 cases are Key Farms, Inc. and Arthur and Patricia Key. Key Farms is a longstanding family farm

MEMORANDUM DISPOSITION
REGARDING CRAMDOWN ISSUES        Page 1

19-02949-WLH12    Doc 128    Filed 06/23/20    Entered 06/23/20 15:41:19    Pg 1 of 12

operating near Pasco, Washington. The farm produces a variety of apples, cherries, alfalfa, seed corn, and other crops. Arthur and Patricia Key together own a 100% interest in Key Farms.

In mid-2014, Key Farms switched its banking relationship such that HomeStreet Bank became its primary financial lender. Since then, HomeStreet has made and modified several loans to Key Farms or to Mr. Key. Most recently, HomeStreet extended a line of credit to Key Farms that Mr. Key personally guaranteed and a term loan to Mr. Key that Key Farms guaranteed. HomeStreet holds first-priority security interests in various real and personal property to secure repayment of these loans.

Several unprofitable farming years left Key Farms unable to repay the line of credit upon maturity. This default triggered corresponding defaults under the term loan and related guarantees. With no consensual restructuring in sight, HomeStreet sued the debtors in Franklin County Superior Court, seeking, among other things, to foreclose on its collateral and to have a receiver appointed. This state-court litigation precipitated the chapter 12 bankruptcy filings at issue here.

Under the debtors' proposed plan, Key Farms will continue farming operations pursuant to 2020-2024 farming budgets attached to the plan. The plan generally provides for repayment of all creditors in full. As it relates to HomeStreet, the plan proposes (i) that HomeStreet will retain its liens and security interests until repaid; (ii) to aggregate the entirety of HomeStreet's allowed claim into a lumped amount, reamortize that amount over twenty years bearing an interest rate of 4.50% (the prevailing "prime" rate of 3.25% plus 1.25%), and repay the reamortized amount via twenty annual payments; (iii) to provide some financial reporting and inspection rights for HomeStreet; and (iv) that HomeStreet will be entitled to relief from stay after a plan default that is not timely cured.[1] HomeStreet opposes confirmation for several reasons.

The court held a full-day evidentiary hearing at which four witnesses testified in court and the parties submitted dozens of exhibits. The court then heard oral argument from counsel for the debtors, HomeStreet, and the chapter 12 trustee. Matters are ready for decision.[2]

---

[1] For more detail see ECF No. 82 at § 2.3(c).

[2] This memorandum addresses the parties' dispute regarding the appropriate cramdown treatment of the HomeStreet debt. The court will address all other issues in an oral ruling at a forthcoming telephonic status conference.

# DISCUSSION

## *Jurisdiction & Power*

The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) & 1334(b) and LCivR 83.5(a) (E.D. Wash.). The parties' dispute regarding confirmation of the debtors' proposed plan is statutorily "core"[3] and "the action at issue stems from the bankruptcy itself."[4] Accordingly, the court may properly exercise the judicial power necessary to finally decide this dispute.

## *Cramdown Generally*

Bankruptcy law in the United States has long recognized the need for some form of nonconsensual debt restructuring. For example, section 43 of the Bankruptcy Act of 1867, as amended in 1874, permitted debt compositions whereby the requisite consenting creditors (in both number and claim amount) could bind dissenters.[5] The Bankruptcy Act of 1898 went further and included several mechanisms that bound dissenting classes of creditors to a plan if that plan provided fair and equitable treatment of their claims.[6] Case law applying these tools recognized the imperative to ensure that a senior stakeholder receive full compensation for its superior rights before allowing junior stakeholders to participate in the post-bankruptcy enterprise. Those same cases decline to require valuation of the plan's consideration to the senior creditor with mathematic certainty.[7] Rather, the bankruptcy court must determine based on the totality of the

---

[3] *See* 28 U.S.C. § 157(b)(2)(L).

[4] *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

[5] *See, e.g.*, Act of June 22, 1874, ch. 390 § 17, 18 Stat. 178 (repealed 1878); *Wilmot v. Mudge*, 103 U.S. (13 Otto) 217, 219-21 (1881); *In re Reiman*, 20 F. Cas. 490, 497-98 (S.D.N.Y. 1874).

[6] *See, e.g., Great Nat'l Life Ins. Co. v. Pine Gate Assocs. (In re Pine Gate Assocs.)*, 2 Bankr. Ct. Dec. 1478, 1482 n.16 (Bankr. N.D. Ga. 1976) (describing "cram down" under Chapters X and XII of the 1898 Act as "a self-evident, vivid term of immediate understanding, perhaps requiring no explanation," one that "creates an instant correct connotation of the involuntary administration of bad medicine upon a recalcitrant victim, the secured creditor who opposes the effects of the reorganization proceedings in the Bankruptcy Court").

[7] *See Grp. of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 565-66 (1943) (Douglas, J.) (explaining that "[a] requirement that dollar values be placed on what each security holder surrenders and on what he receives would create an illusion of certainty where none exists and would place an impracticable burden on the whole reorganization process" because the determination of whether fair and equitable treatment has been provided "cannot be made by the use of any mathematical formula" but instead "rests in the informed judgment of the [courts] on consideration of all relevant facts"); *Consolidated Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) (Douglas, J.) ("The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable. Since its application

case whether the proposed cramdown treatment is fair and equitable to the affected creditors.

The modern Bankruptcy Code codifies cramdown provisions in each chapter contemplating a bankruptcy plan.[8] In a chapter 12 case such as this one, the statute permits cramdown of a secured creditor if:

(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim[.][9]

In the context of cash payments to be made in the future, the need to derive a "value, as of the effective date of the plan" requires discounting to present value. The statute itself, however, provides no discount rate to use for this exercise.[10]

**Till v. SCS Credit Corporation**

In *Till*, the Supreme Court considered the proper approach to determine the discount rate applicable to the cramdown of a secured creditor under a chapter 13 plan. As the Court noted, when a chapter 13 plan proposes to provide a stream of future payments, "the amount of each installment must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim."[11] Accordingly, the Court's task was to select a method for determining an interest rate sufficient to meet this requirement. The Court was presented with four different methods:

---

requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made." (cleaned up)); *Northern Pac. R. Co. v. Boyd*, 228 U.S. 482, 508 (1913) (articulating initial absolute priority rule as one in which a senior creditor may receive new securities that have "equitable terms" and represent "a fair offer" but need not be equivalent to full repayment in cash).

[8] For a contemporaneous account of the cramdown provisions included in the 1978 Bankruptcy Code, see generally Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code*, 53 AM. BANKR. L. J. 133 (1979).

[9] 11 U.S.C. § 1225(a)(5)(B)(i)-(ii).

[10] *See, e.g.*, *Till v. SCS Credit Corp.*, 541 U.S. 465, 473 (2004) (noting how the Bankruptcy Code itself "provides little guidance" about the specific interest rate method "Congress had in mind when it adopted the cramdown provision").

[11] *Id.* at 469 (footnote omitted).

(1) the "formula" approach, in which courts start with a base rate then add an upward adjustment ("generally" in the range of "1% to 3%") based "on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan";

(2) the "coerced loan" or "forced loan" approach, in which courts "consider evidence about the market for comparable loans to similar (though nonbankrupt) debtors";

(3) the "presumptive contract" approach, in which courts start with the rate in the parties' pre-bankruptcy contract and allow for potential upward or, more likely, downward adjustments based on facts about the particular debtor and creditor; and

(4) the "cost of funds" approach, in which courts look to the particular creditor's own costs of borrowing to determine what the creditor would need to pay in order to obtain cash equal to 100% of its claim.[12]

The Court was highly fractured regarding the question presented. Four Justices concluded that approach (1) should apply; four Justices concluded that approach (3) should apply; and Justice Thomas alone believed that because "the statute that Congress enacted does not require a debtor-specific risk adjustment that would put secured creditors in the same position as if they had made another loan," it was appropriate simply to use a risk-free rate with ***no*** upward adjustment.[13] But because the formula approach yielded a result not less than the result that would obtain using the risk-free rate, Justice Thomas concurred in the judgment of the four-Justice plurality adopting approach (1).

The *Till* plurality offered the following key reasons for adopting this approach. First, "the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default," thereby providing an objective starting point from which to make upward adjustments using factors that "fall squarely within the

---

[12] *See id.* at 477-80.

[13] *See id.* at 486-91 (Thomas, J., concurring).

bankruptcy court's area of expertise."[14] Moreover, the plurality explained that this "formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings."[15] Although the approach "begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate," such an allocation of proof "places the evidentiary burden on the more knowledgeable party, thereby facilitating more accurate calculation of the appropriate interest rate."[16]

This analysis constitutes the most definitive current guidance regarding how to determine cramdown interest rates in bankruptcy cases; no Supreme Court opinion has subsequently cited or discussed any aspect of *Till*.

### *Application of* Till *Outside of the Chapter 13 Context*

Due largely to an oft-criticized footnote in the *Till* plurality opinion,[17] it is unclear whether the Supreme Court intended the formula approach to be used outside of the chapter 13 context. Thus, for example, several courts of appeals have concluded that bankruptcy courts in chapter 11 cases should at least consider evidence about "market" lending considerations and not limit their analysis to the *Till* formula.[18] This uncertainty does not exist in this circuit, however; an *en banc* panel of the Ninth Circuit Court of Appeals made clear that the *Till* formula approach also applies in chapter 11 cases.[19]

In any event, the uncertainty probably does not arise at all with respect to chapter 12 cases such as this one, including because the controversial *Till* footnote does not address chapter 12 cases, the relevant statutory language in chapter 12 essentially tracks the chapter 13 language,[20] chapter 12 is a hybrid form of

---

[14]     *See id.* at 478-79.

[15]     *Id.* at 479.

[16]     *Id.* at 484-85.

[17]     *See id.* at 477 n.14.

[18]     *See, e.g.*, *Apollo Global Mgmt., LLC v. BOKF, NA (In re MPM Silicones, L.L.C.)*, 874 F.3d 787, 798-801 (2d Cir. 2017); *Wells Fargo Bank N.A. v. Tex. Grand Prairie Hotel Realty, L.L.C. (In re Tex. Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324, 331-37 (5th Cir. 2013).

[19]     *See First Southern Nat'l Bank v. Sunnyslope Hous. L.P. (In re Sunnyslope Hous. L.P.)*, 859 F.3d 637, 646 (9th Cir. 2017) (*en banc*), *cert. denied*, 138 S. Ct. 648 (2018).

[20]     *See* 11 U.S.C. §§ 1225(a)(5)(B)(ii), 1325(a)(5)(B)(ii).

bankruptcy relief that has more structural features in common with chapter 13 than with chapter 11, and pre-*Till* circuit precedent endorsed the formula approach in the chapter 12 context.[21]

Considering bankruptcy policy more broadly, the formula approach adopted in *Till* furthers important statutory objectives. As the plurality noted, the Bankruptcy Code does not "require that the cramdown terms make the creditor subjectively indifferent between present foreclosure and future payment."[22] Indeed, the *Till* Court expressly rejected interest rate calculation methods that would "aim[] to make each individual creditor whole rather than to ensure the debtor's payments have the required present value."[23] The Supreme Court's rejection of a requirement that the secured creditor be made entirely whole comports with case law and other authorities rejecting the notion that cramdown treatment must produce a post-confirmation debt that the lender could sell or carry on its books at par value.[24] The resulting risk and uncertainty for the secured lender fits with the overriding purpose and function of the cramdown provision:

---

[21] *See In re Fowler*, 903 F.2d 694, 698-99 (9th Cir. 1990).

[22] *Till*, 541 U.S. at 476.

[23] *Id.* at 477.

[24] *See, e.g.*, *In re Mirant Corp.*, 334 B.R. 800, 822, 822 n.71 (Bankr. N.D. Tex. 2005) (commenting how "*Till* makes clear that the market in fact does not properly measure the value of an obligation undertaken in a plan" because "the advantages of bankruptcy, such as the requirement of a court determination of feasibility, the benefits of court supervision, disclosure requirements and limits on debt are not given sufficient recognition by the market" and citing various authorities for the proposition that "[i]t is not appropriate to value securities of a reorganized debtor based on what the market would pay"); *In re Nite Lite Inns*, 17 B.R. 367, 373 (Bankr. S.D. Cal. 1982) (rejecting argument that the cramdown interest rate must be set so "the creditor should receive a note in an amount which would allow the creditor to walk across the street to the bank and sell the note for the face value of their claim"). *See also generally In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1115-16 (3d Cir. 1979) (endorsing conclusion that "evidence of market value should be ignored because the market can be expected irrationally to undervalue the securities of a once-distressed company emerging from a lengthy reorganization," at least "when the securities in issue represent equity in, or long term interest bearing obligations of, a reorganized debtor," because the market's "perception may well be unduly distorted by the recently concluded reorganization and the prospect of lean years for the enterprise in the immediate future"). Law review articles before 1978 discuss these issues in some detail. *See, e.g.*, Walter J. Blum, *Full Priority and Full Compensation in Corporate Reorganizations*, 25 U. CHI. L. REV. 417, 419-21 (1958) (discussing various reasons why view requiring new reorganization securities to be immediately salable for cash had been rejected, including in railroad reorganizations involving cramdown treatment administered by the Interstate Commerce Commission); Walter J. Blum, *The Law and Language of Corporate Reorganization*, 17 U. CHI. L. REV. 565, 581-83 (1950) ("The worth of the new securities is not to be tested by reference to market quotations because that yardstick is patently inconsistent with predicating the plan on reorganization value. Instead their worth presumably is to be gauged by assuming that the corporation's market value has come up to its reorganization value or soon will do so. . . . The seniors are supposed to be compensated in full, but only in terms of reorganization currency which generally is not immediately convertible into dollars except at large discounts.").

providing a ***threat*** of an absolute bare-minimum treatment that a debtor can wield in order to encourage a negotiated, consensual resolution.[25]

In sum, precedent and statutory purpose both support using the *Till* formula to determine the appropriate interest rate that the debtors' chapter 12 plan must provide in order to cramdown HomeStreet. The court thus turns to that analysis.

## FINDINGS & CONCLUSIONS

The analysis regarding whether a bankruptcy plan is fair and equitable, including whether the proposed cramdown interest rate is appropriate, is ultimately a factual determination.[26] The court has considered the entirety of the record presented and categorized facts relating to the debtors[27] based on whether those facts support a lower or higher adjustment to the prime rate of interest.

Factual considerations that weigh in favor of only a modest upward adjustment include:

- Mr. Key has decades of experience in the farming business and substantial familiarity with Key Farms' real property and operations.

- Key Farms is managed by an experienced, professional, and dedicated farm manager, Mr. Todd Carlon. Through Mr. Carlon's testimony and other

---

[25] *See, e.g.*, Daniel J. Bussel & Kenneth N. Klee, *Recalibrating Consent in Bankruptcy*, 83 AM. BANK. L.J. 663, 695 (2009) ("Cram down is also a perfect example of how, in altering baselines, bankruptcy law generates and exploits uncertainty which incentivizes and facilitates renegotiation."); J. Bradley Johnston, *The Bankruptcy Bargain*, 65 AM. BANK. L.J. 213, 286-87 (1991) ("The specter of cramdown's valuation uncertainty and adverse consequences for equity interest holders and the creditors thus creates a bargaining set and serves as an impetus to the parties to avoid possible valuation risks and negotiate a voluntary settlement of debt restructuring issues, thereby creating value by concluding a rearrangement of the firm's obligations."); Richard F. Broude, *Cramdown and Chapter 11 of the Bankruptcy Code: The Settlement Imperative*, 39 BUS. LAW. 441, 453-54 (1984) ("The imposition of the fair and equitable standard and a modified version of the absolute priority rule in chapter 11 is thus designed to bring the parties to the bargaining table in an attempt to avoid the various risks described throughout this article. By compromise and settlement, secured creditors can avoid the risks inherent in collateral valuation and a court-imposed interest or discount rate, and unsecured creditors and equity can avoid the risk of valuation of the company. If these principles are kept in mind by participants in chapter 11 cases, then consent is more likely to be the result of most chapter 11 negotiations.").

[26] *See In re Sunnyslope Hous. L.P.*, 859 F.3d at 646.

[27] The court gives no weight to the testimony of HomeStreet's employee that the appropriate upward adjustment to the prime rate is 2.25%. The employee based this conclusion entirely on the manner in which HomeStreet's banking regulators would require HomeStreet to classify the loan. Any issues arising from the relationship between HomeStreet and its regulators have no bearing here. In fact, *Till* expressly rejects interest rate calculation methods that are influenced by "information about the creditor's costs of overhead, financial circumstances, and lending practices." *See* 541 U.S. at 477-78.

evidence presented at the confirmation hearing, the court was impressed by Mr. Carlon's professionalism, detailed and ready knowledge of Key Farms' current and historical operations and financial affairs, and commitment to his work.  It is clear that Mr. Carlon is personally invested in the farm's success even to the extent of making personal sacrifices to assist the enterprise – such as voluntarily forgoing compensation during periods of limited cash flow.

- The debtors have significant experience using crop insurance programs to mitigate losses including the risk of possible crop failure.  Indeed, Key Farms utilized this insurance to obtain a substantial payment within the past year.

- Under the proposed plan, Mr. and Mrs. Key will commit valuable and otherwise unencumbered personal assets, including their retirement funds and personal home.  The benefit to HomeStreet is twofold.  First, HomeStreet gains the obvious added and significant prospect of repayment from these assets versus a standalone Key Farms plan.  Second, and possibly of greater benefit, risking such assets provides the Keys with a powerful source of motivation to ensure the success of Key Farms and avoid a default under the plan.

- Mr. Key and Mr. Carlon have in recent years actively managed the Key Farms crop mix to reduce plantings of less-profitable or otherwise problematic crops and shift to more desirable crops.

- The debtors have demonstrated an ability to manage around cash-flow difficulties, including by reducing expenses or delaying expenditures.  More specifically, Mr. Carlon's testimony established that Key Farms has been able to continue its operations without significant adverse consequences despite an approximately six-month delay in the receipt of crop insurance proceeds.

- Although there are no formal appraisals or other valuations in the record, existing evidence – including relatively detailed testimony by the debtors' representatives at the confirmation hearing and valuation information from the bankruptcy schedules – indicates that the post-confirmation HomeStreet loan will be meaningfully oversecured.

- The farming budgets accompanying the plan appear to be based on reasonable assumptions and forecast consistent annual profitability. The testimony of both Mr. Key and Mr. Carlon generally supported the integrity and reasonableness of these projections. Although HomeStreet's representative questioned some of the assumptions behind the projections, the criticism was largely non-specific and based on a general skepticism about Key Farms' ability to perform consistent with its budgets.

Conversely, factual considerations indicating greater risk and hence supporting a greater upward adjustment include:

- There is no dispute that Key Farms has a history of operating losses spanning the last several years.

- Key Farms is heavily reliant on crop insurance programs and, in some years, farming operations may cease without the cash flow provided through these programs. Crop insurance programs are at least partially supported through a form of federal subsidy, which could be reduced or terminated.

- Farming is an inherently risky business. To some degree, a farm's success always turns on the vagaries of weather and other natural factors, local and foreign political and economic policies, dietary trends, competition from new versions of old products (such as the recently introduced "Cosmic Crisp" apple), global health pandemics, and several other elements.

- Key Farms works a material amount of acreage owned by multiple third parties. Although the debtors appear to enjoy a good relationship with those parties (as evidenced by the confirmation hearing testimony, including Mr. Ransom who expressed a willingness to continue the present arrangement with Key Farms even at a financial loss), there are no permanent, long-term, formal leases in place. This creates risk that Key Farms could lose access to farmland and hence not realize the profit projected to result from farming that land.

- It remains to be seen precisely how the COVID-19 situation will affect the debtors, including as a result of potential local or national economic circumstances, changing health-related regulation, or otherwise.

- The duration of the post-confirmation obligation to HomeStreet is twenty years – a lengthy period during which many things might happen to impair Key Farms' commercial viability or the value of the debtors' assets.[28] By way of example, the past twenty years have seen remarkable economic and social disruptions resulting from, among other things, the September 11, 2001 attacks, the 2007-2009 Great Recession, and the current circumstances stemming from the COVID-19 situation.

After carefully weighing and balancing the factors discussed above, the court concludes that an upward adjustment to the prime interest rate of at least 1.75% is appropriate. Although every case must be evaluated based on its unique set of facts, several other courts have concluded that a comparable adjustment is appropriate in cases involving a similar mix of factors.[29]

---

[28] HomeStreet contends that a twenty-year term is too lengthy and inappropriately shifts the risk of loss onto HomeStreet, thereby preventing the plan from satisfying the fair and equitable requirement. The court disagrees. The debtors own substantial tangible and permanent assets, including farmland and the Keys' personal home, which will either expressly collateralize or indirectly support repayment of HomeStreet under the plan. These are the type of assets that support longer-term borrowing, such as a conventional thirty-year home mortgage. The risk placed on HomeStreet over twenty years is not akin to the risk that a party forced to make a twenty-year loan to, say, a restaurant or retail business (each of which could see the residual value of the entire enterprise dissipate rapidly, thus creating risk of quick and substantial losses for the forced lender) might face. As such, the repayment term proposed by the debtors is within the realm of fair and equitable treatment. *See, e.g.*, *Travelers Ins. Co. v. Bullington*, 878 F.2d 354, 356-58 (11th Cir. 1989) (affirming confirmation of chapter 12 plan that reamortized debt secured by farmland over thirty years); *First Sec. Bank, N.A. v. Francks (In re John V. Francks Turkey Co.)*, 1999 Bankr. LEXIS 893, at *6-7 (B.A.P. 10th Cir. Aug. 2, 1999) (noting how "[m]ost courts that have addressed the permissibility of stretching out repayments to secured creditors have been lenient in allowing the debtors the maximum time for paying secured creditors" and affirming confirmation of chapter 12 plan that reamortized bank loans secured by real estate over twenty-five years); *In re Prescott*, 2011 Bankr. LEXIS 5332, at *6-9 (Bankr. S.D. Ga. Dec. 21, 2011) (approving cramdown loan with twenty-five-year term in chapter 12 case when the lender was oversecured via real estate that "traditionally is not a depreciating asset" and the lender retained an "ability to request relief should Debtor fail to comply with the terms of its confirmed plan"); *In re O'Farrell*, 74 B.R. 421, 423-24 (Bankr. N.D. Fla. 1987) (finding that thirty years was a reasonable duration for a chapter 12 plan's proposed repayment of debt secured by real estate); *In re Mulnix*, 54 B.R. 481, 484 (Bankr. N.D. Iowa 1985) ("A payout over 20 years is not excessive or unreasonable when the collateral is real estate.").

[29] *See, e.g.*, *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d at 334-35 (affirming bankruptcy court's adoption of 1.75% adjustment when the debtor was well managed, "the Debtors' owners were committed to the business," the lender's "collateral was stable or appreciating, and . . . the Debtors' proposed cramdown plan would be tight but feasible"); *In re Tapang*, 540 B.R. 701 (Bankr. N.D. Cal. 2015) (adopting 1.75% adjustment for twenty-five-year cramdown plan based on debtor's historical financial performance, relative ability to maintain, repair, and improve the property, and projected performance); *In re RTJJ, Inc.*, 2013 Bankr. LEXIS 481, at *27-29 (Bankr. W.D.N.C. Feb. 6, 2013) (finding a 1.75% adjustment to be reasonable given the nature of the collateral, the fact that "[m]anagement is competent, experienced and motivated," and because the bankruptcy filing was not caused by fraud or mismanagement but by various macroeconomic issues); *In re Prescott*, 2011 Bankr. LEXIS 5332, at *3-7 (approving 1.75% adjustment in chapter 12 case in which the lender was oversecured, the debtor's "monthly income fluctuates widely," the debtor had relied on governmental subsidies, and the debtor's operations depended on weather and economic factors); *In re Hudson*, 2011 Bankr. LEXIS 1010, at *11-22 (Bankr. M.D. Tenn. Mar. 15, 2011) (confirming chapter 12 plan incorporating 1.75%

## SUMMATION

The debtors' proposed plan is generally confirmable with a single exception: the proposed 1.25% upward adjustment from the prime rate of interest does not appropriately reflect the totality of HomeStreet's risk. Based on the factors already discussed, the court concludes that an upward adjustment of at least 1.75% is required for the debtors to cramdown HomeStreet. The court will schedule a telephonic conference with the parties to discuss how to proceed in light of this decision.

---

adjustment based on value of the debtors' real estate and reasonable-but-still-uncertain prospects for the debtors' post-confirmation operational success). *See also generally In re Country Morning Farms, Inc.*, 2020 Bankr. LEXIS 307, at *2-3 (Bankr. E.D. Wash. Feb. 4, 2020) (Corbit, J.) (concluding that a 2.25% adjustment was appropriate based on "the record, testimony, applicable caselaw, and risk factors" that included a history of problems with management).